Whitaker, Judge,
dissenting:
I am not convinced that the loss of plaintiff’s Niland and Imperial farms was the “reasonable and natural consequence of the evacuation” of plaintiff. No doubt the evacuation was a contributing cause, but the immediate, proximate cause, it seems to me, was the decision of the Ralphs to foreclose a mortgage on the Imperial Farm, which had for many years been in default, and of the similar decision of the mortgagees with respect to the Niland Farm, the mortgage on which had also been in default for many years.
One cannot help but sympathize with a woman in plaintiff’s predicament: she relied upon the forebearance of Charles B. Ralphs, who she thought was her friend, but who seemed to have been unable to resist the tide of anti-Japanese sentiment and who turned against her, and she relied upon the advice of her lawyer, who was indifferent to her interests. It was the action of these men and the mortgagees in the case of the Niland farm that was the cause of plaintiff’s loss. This attitude and the actions of these two men was probably induced by the anti-Japanese sentiment in the community at *133the time, but the United States has not opened itself to liability for damages caused by anti-Japanese sentiment; it has only made itself liable for damages which were the “reasonable and natural consequence of the evacuation.” It would establish a dangerous precedent for us to hold the United States liable for the loss of these two farms, under the facts of this case, however much we may sympathize with plaintiff.
I regret to disagree, even to this extent, but I feel compelled to do so. Defendant does not object to the recommendation of the Trial Commissioner to allow recovery of $5,837.50 for the loss of household furnishings and personalty, and of $835 for the loss of her capital investment in rice cultivation. I agree that she is entitled to recover $6,672.50. I would enter judgment for this amount.
OPINION OK COMMISSIONER
Eighteen years have passed since Mary Sonoda lost the property she is suing for today. She and her family were victims of the anti-Japanese hysteria which swept the American far west in the months following the debacle at Pearl Harbor in December 1941 and resulted in the summary uprooting of 110,000 native-born American citizens of Japanese ancestry from their homes, farms and businesses in a restricted western zone and their exile through 1944 in distant relocation centers and elsewhere. In 1948 Congress enacted the Japanese American Evacuation Claims Act (62 Stat. 1231,50 U.S.C. App. 1981, et seq.) to expiate the moral wrong done under official auspices to the innocent objects of this forced exodus. A 1956 amendment to that Act (70 Stat. 513) gave jurisdiction to this court to entertain suits by those of the dispossessed who had been unable to obtain acceptable relief through the claims procedures administered by the Attorney General pursuant to the original Act and an interim amendment thereto. This is a case of first impression with this court under its newly acquired jurisdiction.
Attention is drawn first to that part of plaintiff’s claim concerning the loss of her 320-acre Imperial farm in the Imperial Valley of southern California. The dispositive issue is whether the loss of the farm was the reasonable and natural consequence of the evacuation of the plaintiff and her *134family in May 1942, as she must establish in order to come within the grace of the statute, or whether, as the Government contends, it was not the plaintiff’s delinquency in payments under her deed of trust that resulted in loss of the farm through foreclosure. More simply, it must be determined whether the plaintiff would have lost the farm if she and her family had not been evacuated or threatened with evacuation.
The plaintiff is the eldest of three American-born daughters of Tom Sonoda, a Japanese subject who emigrated with his wife to this country in 1903, settled in the Imperial Valley as a farmer, and for many years operated the Imperial farm on a rental arrangement with its owner, John C. Ralphs, Sr. The accompanying report of facts recites in exhaustive detail how Tom bought the property from Ralphs for Mary for $48,000 in 1924, how the lawyers and title company bungled the preparation of legal instruments so that Mary held a deed purporting to convey the entire 320 acres but held technical title to only half while the deed of trust assumed by her unintentionally covered the same half and left the other half unencumbered, how in 1940 the plaintiff signed a new deed of trust and a more liberal note for the $18,000 balance remaining on the original note after payments totaling over $58,000 in principal and interest had been made over the years, and how the incredible errors in the original title documents remained undetected by all save Tom Sonoda until 1942.
The violent xenophobia in California towards persons of Japanese descent in the months following Pearl Harbor is a matter of public record and need not be repeated here beyond the meager description in the accompanying findings. On February 19, 1942, at the urging of the War Department and influential citizens and organizations in the western states, President Roosevelt issued Executive Order 9066 which authorized military commanders to establish military areas and exclude therefrom any or all persons as a security measure. On March 2 General DeWitt issued Public Proclamation No. 1 establishing Military Areas Numbers 1 and 2 blanketing broad areas of the far west and announcing the imminence of exclusion of persons of Japanese ancestry *135from Military Area No. 1, which included all of Imperial County. Thenceforth all Americans of Japanese blood, regardless of their citizenship and place of birth, were momentarily expecting to be evicted from their homes within the restricted areas. Directly after Pearl Harbor thousands of Japanese aliens who had lived and worked in the western area all their adult lives were rounded up and interned pursuant to the Alien Enemy Act (50 U.S.C. 2-1-24).
In the meantime the prevailing odium attached to the Japanese community made it difficult to secure help on their farms. Tom Sonoda experienced this difficulty immediately after the onset of war, and it was accentuated by the sudden scarcity, through departure, of Japanese farm labor on whom he had previously depended for the more skilled farm chores such as sorting and packing choice produce. This lack, coupled with his expectation of momentary arrest and internment as an alien enemy, naturally affected his crop plans and performance, although paradoxically he feared that he would be charged with food sabotage if he did not go through the motions of raising crops. The previous year he had plowed up all of the asparagus which had been growing on the Imperial farm as its mainstay crop for 14 years and had about played out. The land itself had by then become highly alkaline due to the high proportion of salt in the irrigation water. This had affected the fertility of the Imperial farm and decreased its crop yields as well as its market value. The condition was common throughout most of the Imperial Valley and corrective measures involved costly tilling, leveling and soil leaching. Thus the farm was not in a notably productive state in 1942' due both to war conditions and soil conditions.
On March 14, 1942, the District Attorney of Imperial County wrote the heirs of the estate of John C. Ealphs, he having died in 1931, and urged them to secure the possession of the Imperial farm from the plaintiff by foreclosure under the delinquent deed of trust note. The Ealphs were undoubtedly infected at the time by the prevailing anti-Japanese virus, and this gratuitous letter from the prosecuting authority, plus a long record of the plaintiff’s delinquencies in payments, was most influential in persuading *136them to foreclose against the plaintiff, despite the fact that they had been friendly with the Sonoda family for many years. This decision came on top of many problems which piled up suddenly on Mary Sonoda in the month of March. Her father had been arrested and interned on March 17 and she was summoned home from Los Angeles to take charge of the crumbling family fortunes. A discount purchaser of Mary’s defaulted crop loans had sued her and attached her bank accounts and her farm. She had recently executed custodial assignments of her crops to her friend and trusted neighbor, Charles B. Ralphs, who as co-executor of his father’s estate had always theretofore interceded in the plaintiff’s behalf to forestall the demands of the other heirs for foreclosure. The plaintiff had also appointed Charles B. Ralphs as executor of her will and as her attorney in fact under a power of attorney which he had accepted and by which he agreed to manage and protect her farm interests during the interregnum of her impending evacuation. These were all moves of desperation.
Just at this time in late March the Ralphs suddenly discovered through chance that the deed of trust covered only half of the Imperial farm and the other half remained unencumbered. They also found coincidentally that Mary had title technically to only that half of the farm which was encumbered. The Ralphs, without benefit of consulting Tom Sonoda, who was then interned, concluded arbitrarily and probably erroneously that Tom had known of the title errors all through the years and had concealed this fact from them in order to derive benefits for himself. This hardened their attitudes towards Tom and provided a synthetic placation of conscience in following through with their otherwise distasteful plan to foreclose. Had it not been for this small encouragement Charles B. Ralphs admitted they would have let matters drift along for a while. The Ralphs decided to file suit to reform the defective deed of trust and to ask Mary to sign a new deed of trust expanded to cover the entire property, following which they would proceed to foreclose. The consideration to Mary for her cooperation is hard to discern.
Something must now be said of Mary’s defenseless situation. While she was nominally the owner of the Imperial *137farm, sbe was in reality a straw figure and Tom. was the indispensable party to its operation. Mary was well educated but knew nothing about farming. Sbe had been away from home pursuing education and employment for the preceding 12 years since the age of 16, was not familiar with the circumstances of the title errors, and felt herself surrounded by a perilous sea of hostility, metaphorically speaking. Her only friends, she thought, were Charles B. Ralphs and Attorney Hickcox. Hickcox had been Tom’s attorney for many years, had done his bit to create the errors in the title transactions in 1923 and 1924, and Tom had told Mary that if he were to be taken away she was to consult Hickcox for advice concerning legal matters.
On March 27, the Ralphs filed a reformation suit unbeknownst to Mary. The following day Charles B. Ralphs called upon Mary at the farm where she was living with her mother and younger sisters. On this occasion Ralphs had with him a new deed of trust which he asked her to sign in order to correct the ancient errors, which he endeavored to explain to her and she did not fully comprehend. Before signing she telephoned Attorney Hickcox for his advice, which it is reported amounted to a supine “Under the circumstances, what else can you do?” It is no reflection on the integrity of Hickcox, who died long prior to trial, to say that this advice was of about the same inspired caliber as that which he had given many years before in the manufacture of the original title errors. Instead of being a tower of strength for a defenseless girl to lean upon, he proved to be a weak reed. The record gives reason to believe that Hickcox was anxious not to incur popular displeasure by identifying himself too prominently with a public defense of his erstwhile Japanese friends and clients, for such conduct might have business and social repercussions in the community. It must, of course, be remembered that Hickcox was not available at trial to defend his actions or challenge the plaintiff’s account of them. Nevertheless, the record provides an unrefuted prima fade case of non-feasance on the part of Hickcox. Had he taken a vigorous stand in Mary’s behalf it is likely that it would have left traces in the record.
*138Mary was thus very much alone on this important occasion. Frightened as she was by the agonizing turn of events for her loved ones, her prospects bleak, her back against the wall by the seizure of her farm and her bank accounts, her father imprisoned, bereft of funds and reliable friends, isolated by a curfew and travel ban, she was naturally willing to do anything she was told to do in order to avoid further difficulties without thinking of the consequences, assuming she was then in a condition to gauge the consequences. Upon undertaking the power of attorney for Mary, Charles B. Ralphs had been advised by counsel that his fiduciary position as attorney in fact for Mary would be in basic conflict with his position as his father’s executor should he have to force the deed of trust to foreclosure. Through his intercession the Ralphs’ heirs had tolerated the plaintiff’s deed of trust delinquencies for many years with only occasional remonstrance. In demanding that Mary sign the expanded deed of trust Charles B. Ralphs not only violated the spirit of his fiduciary relationship with Mary; he also performed a singularly heartless act against her in her time of trouble, traducing a life-long friendship and failing even to give her the advice and opportunity to consult with her interned father. It has been and will be shown how worthless was Mary’s reliance on her attorney. Were this a case to void the deed of trust which she was inveigled into signing under extreme conditions, counsel should have little difficulty.
The law under which the plaintiff comes here permits, by interpretation, recovery of losses incurred prior to evacuation if the prospect of evacuation led the claimant into flagrantly unwise dispositions of property under conditions of distress which, had there been no threat of evacuation, would not have occurred. If Mary had refused to sign the expanded deed of trust on March 28, quite clearly the Ralphs could have foreclosed on the south half of the Imperial farm, for the payments were in arrears and there was no real prospect of their being caught up. But in order to foreclose on the unencumbered north half of the farm the Ralphs would have had to proceed with their reformation suit, and to say now that such a suit would have succeeded would be to engage in rank speculation. It is just as reasonable to *139surmise that in the intervening months the Sonodas (assuming they were not evacuated) would have been able to reach a compromise with the Ralphs to restrict the forfeiture to the south half of the property so as to give them an opportunity to work their way out of the debt. To say that the Ralphs would have ultimately attached the unencumbered north half of the property to satisfy prospective deficiencies at foreclosure sale on the south half is also to speculate without warrant, to presuppose that Tom Sonoda’s considerable resourcefulness would not have been available and have eventually prevailed, or that the charity and longstanding friendship of the Ralphs would not reassert itself. The plaintiff claims that Charles B. Ralphs was duty-bound to apply against the note fiduciary funds in his hands derived from sales of the plaintiff’s crops, but the record shows these funds to have been properly expended by the fiduciary in payment of other bills incident to the farm management. Of course the record does not show any proceeds from the one-year rental of the farm commencing July 1, 1942, but nothing was asked the witnesses at trial about this and no point made of it since, so a claim cannot be either supplied or measured. It seems shocking that property which Mary bought in 1924 for $48,000 should have brought no bidders at $18,000 in January 1943, but the record does not explain this drastic decline and no inference can or should be drawn from it. The parties agreed that the fair market value of the property in May 1942 was $24,500.
As a denouement to the story, it should be mentioned that, after taking the property in for $18,000 at the bidderless foreclosure sale, the Ralphs sold it for $18,000 in September 1943 to a purchaser who has successfully operated the farm ever since after spending a considerable sum in its improvement. In retrospect, the Ralphs in a real sense were fortunate to have received over $59,000 for property which eventually proved to be salable for only $18,000. In all, they received a total of over $78,000, not a bad sum even though much of it was in interest. Under the facts related it must be concluded that the plaintiff has established the loss of the north half of the Imperial farm, but not the south half, to have been, at least in part, the reasonable and natural consequence of her *140evacuation and threat of evacuation, leaving for solution the valuation of the recoverable loss. The jurisdictional act is silent as to the controlling date for valuation of the property lost. The defendant would contend for a valuation date of May 1942, or January 1943, when the north half of the property had a fair market value of $13,050, while the plaintiff would contend for a date no earlier than July 1948, when the figure had risen to $18,600, an increase of $5,550.
The defendant rests its case for the earlier date almost entirely on the 1950 adjudication of the Attorney General under the original parent act in the claim of Kawaguchi, No. 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, contained in the bound volume of precedent decisions under the Japanese-Evacuation Claims Act. It is not necessary to pass judgment on the correctness of the Attorney General’s analysis in that case, for the Act which it sought to interpret did not contain the significant language added by the 1956 amendment directing this court to “hear and determine said claim in the same manner and under the same rules as any other cause properly before it and applying rules of equity and justice.” (50 U.S.C. 1984(b).)
In adopting this particular phraseology it is believed that the Congress intended the court to function in a manner not unlike its performance under 28 U.S.C. 2509 in claims referred to it by| either House of Congress, for this is a familiar pattern in the long history of the relations between the Congress and the court. In Lamborn and Company v. United States, 106 Ct. Cl. 703, 723, the court said as to another special jurisdictional act containing the same phrase that the Congress used the term “equity and justice in its broad meaning rather than in the strict sense in which such term is understood and applied in equity jurisprudence.” In the present case the term should be construed to give latitude rather than license, but a measure of freedom nevertheless to depart from the legalistic strictures of the normal rule in damages that judgments shall be based on valuation at the time of loss and unaccompanied by interest, or by the judge-made rule in eminent domain cases which ties the recovery to valuation at the time of taking augmented by reasonable interest to the time of judgment to be considered as part of just compensation. The present claim eludes *141classification into the normal formulae of precedents; it is neither a tort nor a taking, but considerably more severe tban tbe latter since here the people were taken away from the land, thus permitting the land to be taken away from the people. Equity and justice in the instant case would decree a valuation date of July 1948, when the Congress first provided the injured with a forum, for this would reflect in Mary’s case the normal developments in the period when redress was not available and would theoretically enable the plaintiff, if she so chose in 1948, to fully replace her loss of the north half of the Imperial farm by property of comparable size, quality and location. This is not to say that this result should have common application to all cases now pending here under the same jurisdictional act. Rather, it implies the application of equity and justice under the circumstances of the individual case, an approach consistent with the conceived intention of the Congress.
In this case the fair market value of the north half of the Imperial farm is the sum indicated. In view of all the circumstances — the debts that plaintiff owed, the likelihood that this and other properties might have been subject to attachment and perhaps to judicial sale — it cannot be determined definitely that the property could have been fully saved. On the other hand, it certainly cannot be said that it would have been totally lost. No doubt, if plaintiff had not been taken away, at least a portion of its value would have been saved through negotiation, adjustment, part payment, or extension of indebtedness.
In the circumstances we find that one-half of the loss of the value of the north half of the Imperial farm was a reasonable and natural consequence of the action taken by the Government in excluding plaintiff from the area of the property. This we find to be $9,300. The Act specifically authorized compromise and settlement of the claim. Since this court’s jurisdiction in this matter is conferred by the same Act, we think this court likewise has considerable leeway in implementing the purposes of this legislation.
Mary owned and lost another farm as a result, she says, of her evacuation. This was a farm of 160 acres at Niland, in the Imperial Valley, which Tom had bought in her name *142in 1935 for $2,000 in cash and $2,000 in two mortgages on separate parts of tbe property. By April 1942 Mary owed $764.64 on one of the mortgages and $488.37 on the other. She also owed $371 in tax arrears. One of the mortgage holders sued her in April 1942 to foreclose, and he probably did foreclose on 103 acres but the record does not provide the actual fact. The other mortgage holder was also pressing for payment at the same time and, in April 1942, Mary, acting on the advice of her attorney Hickcox, deeded the mortgagee 57 acres of the property worth $2,500 in satisfaction of a $764.64 note balance. This hardly seems to have been a conscionable exchange, but Mary was beleaguered from all sides, and besides her lawyer had advised this way out. The entire Ni-land farm was worth $8,250 at this time, against which the overdue mortgages totaled $1,253.01 and the tax arrears totaled $371. The taxes would have waited, for it was not uncommon at that time and place for farmers to be in tax arrears, and Mary had been in that position before and had cleared up her taxes. But the mortgagees apparently would not wait, there appearing at the time to be no effective advocacy on Mary’s behalf and no pity wasted on persons of Jap-áñese ancestry, even native-born United States citizens. It seemed popular to bait the Nisei.
The logical inquiries in the case of the Niland farm are whether Mary’s actions were those that a reasonable person would have pursued under identical circumstances and, if not, whether her impending evacuation was the causative factor in her taking unreasonable action which led to the loss of the Niland farm. It was manifestly not reasonable to have surrendered 57 acres worth $2,500 for a mere $764.64 note, for she gained nothing in exchange for her voluntary cooperation and lost $1,735.36 to boot. Had she let this mortgagee foreclose, as she did the other, the procedural delays would have carried her beyond the time several weeks away when the proceeds of crop sales would provide her with the cash to pay both mortgages. She would thus have an $8,250 property subject only to $371 in tax arrears. Even if she had elected to pay off only one of the mortgages for $488.37 it would have saved her 103 acres of the farm worth $5,750. During her absence the property could have *143been, rented, for more than enough to meet recurring taxes and, at the end of the period of expulsion, she and her family would have had at least one farm as an asset either to work, sell or rent. Attorney Hickcox, who had virtually abdicated his duty to advise his client, can be charged as the architect of Mary’s inaction or wrong action. Mary needed sound legal advice, and that she did not get. On July 20, 1942, Hickcox wrote to Mary at her place of confinement announcing that Ralphs had on hand over $4,000 belonging to her from the sale of crops, and requesting advice as to what bills she wished to pay. Clearly it was Hickcox’s duty as her lawyer to give instead of seek advice, and to urge Mary to use part of the funds to save the Niland farm. At no time did Hickcox demonstrate that he was acting in Mary’s interests. She herself was obviously suffering from a paralysis of will which prevented her taking the preservative steps that a reasonable, prudent person would have taken under the same state of facts. This eclipse of her volition was the direct consequence of the impending evacuation and all the forces it had set in motion. Presence of adequate counsel would normally offset the effect of Mary’s own incapacity, but, more than a vacuum, Mary’s legal advice was detrimental to her interests at every turn, intentionally or not. One cannot escape the impression throughout this case that, once the innocent victim showed no capacity for resistance, the vultures gathered from all directions to join the feast. It would seem elementary under the governing statute that where the prospect of evacuation compels an evacuee to entrust his property and affairs to representatives who, either through dishonesty or negligence cause a substantial dimini shment in or loss of the property entrusted, and the evacuee is not himself at fault, such losses are recoverable if they meet other criteria of the statute.
The plaintiff is entitled to reimbursement for the loss of her Niland farm and, consistent with the formula applied to the Imperial farm loss, the measure of her recoverable loss will be the July 1948 fair market value of $15,300 diminished by $1,253.01 in mortgage indebtedness and a further $3,000 in tax arrears, for a net recovery of $11,046.99.
*144The petition sets forth additional claims. Mary expended $4,000 in 1941 to prepare 100 acres at the Niland farm to plant cantaloupes, but cantaloupes were not planted. They would normally have been planted from late December 1941 through January 1942, and there is no explanation of why Tom did not plant them after spending so much in preparation, unless it is that he could then see the impossibility of securing farm labor to cultivate and harvest them and so decided to stop sending good money after bad. This loss of $4,000 in preparatory costs is not properly attributable to the evacuation of the Sonoda family, but to a climate of public opinion which the statute does not reach. The same can be said of Mary’s $8,800 claim for the loss of the 17-acre tomato crop under cultivation at the Niland and Imperial farms from late November 1941 through the early months of 1942. Tom admittedly could get insufficient help to cultivate, harvest, pack and ship the entire crop so two-thirds of it was left to die on the vine. The Filipino sharecropper who tended Mary’s two-acre tomato crop at the Imperial farm quit in early January for patriotic reasons and so this small acreage was completely lost. Clearly the tomato loss cannot be charged to the evacuation and is not reimbursable. The record is silent as to what happened to the proceeds of sale of that part of the Niland tomato crop which was harvested, and in the void of proof no inference can be drawn favorable to the plaintiff.
The plaintiff also claims $2,881.10 as the loss of her investment in converting two rented tracts to rice cultivation. One of them was the Hancock farm which the plaintiff rented for $250 for a seven-month period expiring November 30, 1941, and spent another $250 on after the termination of the lease in removing a levee as the lease required. Another was a tract of virgin land rented for two years commencing May 1, 1941, on which the plaintiff spent $1,669.27 in clearing and preparing for rice cultivation. By February 5, 1942, the plaintiff had received proceeds of rice sales totaling $5,440.55 from these two properties. The costs of the Hancock lease and removal of the levee therefrom were purely lease obligations and not evacuation casualties, for all of the loss had transpired long prior to any pre-*145evacuation effects, and it is not inferred that the plaintiff contemplated further rice cultivation at that location under a renewal lease. The plaintiff’s costs in clearing and preparing the virgin land for rice cultivation, however, can be considered to be a capital investment spread over the two-year lease period, the profits from the first half of which had already been garnered. Evacuation of the Sonoda family in May 1942 prevented the planting of rice for the second year of the lease, thus depriving the plaintiff of half of her initial preparatory expenses, or about $885. This was in fact a loss of capital investment in a leasehold and is reimbursable in that amount. It is not barred by 50 U.S.C. App. 1982(b) (5) precluding consideration of claims for loss of anticipated profits or earnings, for plaintiff is not seeking restoration of the profits she may have earned in the second year of the lease, but rather the loss of benefit from half of the capital investment already made and whose utilization her evacuation prevented.
Another claim dealt with in finding 53 concerns a $370 difference between a loan made to Mary by one Esther Ehoads which Mary’s attorney in fact, Charles B. Ealphs, closed out by paying Ehoads $1,630 from Mary’s funds in his possession. As the special finding indicates, the claim is based on a non sequitur, for the money represented by the $2,000 loan did not go through Ealphs, and he otherwise accounted for all the receipts that did. As background, the $2,000 was borrowed to pay off an attaching creditor who was suing Mary on some crop loans in March 1942, as referred to earlier. The crop loans were on Mary’s tomato crop then languishing, and the suitor had acquired the notes at discount from the original obligee. Mary contended but failed to prove that the original obligee had been fully paid by the shipment of tomatoes, and that thus in paying off the suitor she paid the same obligation twice. It is true that one-third of the tomato crop was harvested, but when or for how much is not shown, and there is no trace of the sales whatsoever. The precise theory urged by the plaintiff for recovery is not clear, but the facts disclose nothing to be reimbursable on any theory for which the evacuation was responsible. It cannot be expected that all claimants who were evacuated will have preserved their records *146intact in anticipation of future lawsuits, so some measure of tolerance is due. Exactly where liberality ends and requirement of legal proof begins resists a categorical standard applicable to all cases.
Still another item in plaintiff’s claim is for $1,919.85 which she says her attorney, Hickcox, received for her in December 1942 and that she never got. Hickcox had advised Mary on December 31 that he had collected the money and had applied it to her guardian account as instructed. Here the story ends, for the record provides no clue as to the guardianship account referred to or the ultimate resting place of the money. Neither Mary nor Tom ever asked Hickcox for an accounting for this sum, and it must be assumed that the Sonodas received it. Mary’s contention is that Hickcox retained it, perhaps as a fee due from Tom, in which case it would not have been proper for Hickcox to have satisfied it with her money. The claim is not supported by qualitative evidence and so is not entitled to consideration.
The sole element of the plaintiff’s claim to which the defendant accedes is a loss of $5,837.50 for household furnishings, farm equipment, rice seed and motor vehicles due to the evacuation of the Sonodas and, there being no disagreement, this amount is allowable. The defendant seeks to offset against this recovery a bill for $700 for fertilizer which the plaintiff is said to have been charged with prior to evacuation and escaped payment of because of her evacuation. Evidence both as to the charge and the failure to pay is equally inconclusive. Even if the facts were established it should not result in the offset. It must be assumed that the creditor could have pursued collection through legal channels against Mary even during her absence and, if he did not do so, this was not so much a boon to Mary created by the evacuation as it was remissness on the creditor’s part.
Of the plaintiff’s total claim, elements aggregating $9,300, for the northern half of the Imperial farm, plus $17,719.49 ($11,046.99 for loss of the Niland farm, $835 for loss of capital investment in rice cultivation, and $5,837.50 for loss of household furnishings, etc.) have been shown to be the reasonable and natural consequence of evacuation or threat *147of evacuation, and the plaintiff is entitled to judgment in the amount of $27,019.49.
FINDINGS OF FACT
1. The plaintiff, Mary Taki Sonoda, is a citizen of the United States and was born at Imperial, California, on October 5,1914. She is now a resident of Chicago, Illinois. She is a person of Japanese ancestry, being the daughter of Tomoji and Sachi Sonocla, both of whom were born in Japan. As a matter of convenience, the plaintiff will hereinafter be referred to as Mary and her father as Tom. As of December 7,1941, Mary resided in Los Angeles, California.
2. On March 2, 1942, Public Proclamation No. 1 was promulgated, pursuant to Executive Order 9066, dated February 19, 1942, establishing Military Areas Numbers 1 and 2 and announcing the imminence of the exclusion of persons of Japanese ancestry from Military Area No. 1, which included Imperial County, California. As early as mid-February 1942, and perhaps before, the plaintiff, her two parents, and her two sisters expected, with reason, to be evacuated from their home in Imperial County, California. Tom was arrested on March 17, 1942, pursuant to the Alien Enemy Act (50 U.S.C. 21-24), and was interned as an alien enemy under that Act successively at Tujunga in California, and at Santa Fe and Lordsburg, in New Mexico, until his release on parole in March 1943, when he was removed to the Poston Eelocation Center in Arizona to join his family in evacuation and exclusion under Executive Order 9066. Had he not been so arrested under the Alien Enemy Act it is “deemed” (under 50 U.S.C. 1981(b) (3)) that he would have been evacuated with the rest of his family in May 1942. In May 1942 the plaintiff, together with her mother and two sisters, was removed from Imperial County by order of a military commander pursuant to Executive Order 9066, and was involuntarily evacuated to the Poston Eelocation Center in Arizona. Plaintiff remained there until her release in April 1943. The plaintiff and her entire family were prohibited from returning to Imperial County by virtue of the same military authority until January 2, 1945. *148Approximately 110,000 other American-born, citizens of Japanese ancestry, mostly from California, were similarly evacuated and excluded.
3. On July 2, 1948, Congress passed an Act “To authorize the Attorney General to adjudicate certain claims resulting from evacuation of certain persons of Japanese ancestry under military orders” (62 Stat. 1231). This Act was amended by the Act of August 17, 1951 (65 Stat. 192) and further amended by the Act of July 9, 1956 (70 Stat. 513), which latter Act was entitled “An Act to amend the Japanese-American Evacuation Claims Act of 1948, as amended, to expedite the final determination of the claims and for other purposes.” As amended (50 U.S.C. App. 1981-1987 (1958 Ed.)), the Act reads in pertinent part as follows:
§1981. * * *
(a) The Attorney General shall have jurisdiction to compromise and settle and make an award in an amount not to exceed $100,000 as hereinafter provided on any claim by a person of Japanese ancestry against the United States arising on or after December 7,1941, when such claim is not compensated for by insurance or otherwise, for damage to or loss of real or personal property (including without limitation as to amount damage to or loss of personal property bailed to or in the custody of the Government or any agent thereof), that is (except as is otherwise provided by subsections 1(b)(2) and 1(b) (3) [subsection (b) (2) and (b) (3) of this section] a reasonable and natural consequence of the evacuation or exclusion of such person by the appropriate military commander from a military area in Arizona, California, Oregon, or Washington; * * * under authority of Executive Order Numbered 9066, dated February 19, 1942 * * *.
(b) As used herein—
(1) “Evacuation” shall include voluntary departure from a military area prior to but in anticipation of an order of exclusion therefrom.
(2) “Claims by a person of Japanese ancestry” shall include claims that were filed by any profit or nonprofit organization, corporate or otherwise, the majority of whose stock was owned by, or the majority of whose stockholders or members were, on December 7,1941, and on the date of the filing of the claim, persons of Japanese ancestry actually residing within the continental limits of the United States or its Territories: Provided, how*149ever, That the losses sustained by the particular organization were the result (1) of the evacuation and exclusion of its stockholders or members, or (2) of the evacuation and exclusion of persons of Japanese ancestry upon whom the organization depended for its business or support. Such claims shall not be barred by awards or disallowances heretofore made.
(3) “Claim by a person of Japanese ancestry” shall also mclude claims which have been timely filed for such damage or loss as heretofore defined incurred by persons of Japanese ancestry detained, interned, or paroled, and subsequently released, pursuant to Revised Statutes, sections 4067-70, as amended (relating to alien enemies) [sections 21-24 of Title 50]. Such claims shall also include losses due to the exclusion of the families and relatives of such persons during their detention or internment. Any such person shall be deemed to have been excluded from such military areas and territories as of the date he would have been evacuated had he not been detained or interned. The claim of or on behalf of such person shall not be barred by any award or disallowance heretofore made.
* * * * #
§ 1982. * * *
(a) The Attorney General shall receive claims for a period of eighteen months from the date of the original enactment of this Act [July 2, 1948]. All claims not presented within that time shall be forever barred: Provided, however, That any claim received by the Attorney General bearing a postmark prior to midnight, January 3,1950, shall be considered to be timely filed within the said eighteen months. Any claim, timely filed, may be amended at any time prior to its final determination in order to include then compensable items of claim which, by the provisions of this Act [sections 1981-1987 of this Appendix] as they existed when the claim was filed, the Attorney General was not authorized to determine or consider.
(b) The Attorney General shall not consider any claim—
(1) by or on behalf of any person who after December 7, 1941, was voluntarily or involuntarily deported from the United States to Japan or by and on behalf of any alien who on December 7,1941, was not actually residing in the United States;
(2) except as provided in section 1(b)(3) [section 1981(b) (3) of this Appendix], for damage or loss arising out of action taken by any Federal agency pursuant *150to sections 4067, 4068, 4069, and 4070 (relating to alien enemies) of the Bevised Statutes, as amended [sections 21-24 of Title 50], or pursuant to the Trading With the Enemy Act, as amended * * *
(3) for damage or loss to any property, or interest therein, vested in the United States pursuant to said Trading With the Enemy Act, as amended * * *
(4) for damage or loss on account of death or personal injury, personal inconvenience, physical hardship, or mental suffering; and
(5) for loss of anticipated profits or loss of anticipated earnings.
*****
§1984. * * *
(a) The Attorney General is authorized to compromise and settle and make an award in an amount not to exceed $100,000 on any claim timely filed under this Act, as amended [sections 1981-1987 of this Appendix], on the basis of affidavits, available Government records, and other information satisfactory to him.
(b) The Court of Claims shall have jurisdiction to determine any claim timely filed under this Act [sections 1981-1987 of this Appendix]. A petition for the determination of a claim by the Court of Claims shall be filed with the clerk of the said court and a copy of the petition shall be served upon the Attorney General by registered mail. Such a petition may be filed at any time after enactment of this subsection except that it must be filed within ninety days after the date of a notice by the Attorney General served on the claimant by registered mail that no further consideration will be given to the compromise of the claim. Upon the timely filing and serving of such petition, the Court of Claims shall have jurisdiction to hear and determine said claim in the same manner and under the same rules as any other cause properly before it and applying rules of equity and justice. Upon being served with a copy of such petition, the Attorney General shall forthwith certify and transmit to the clerk of the Court of Claims the original statement of the claim and any requested amendments thereto for filing with the said clerk as a preliminary record in the case. Such petition shall, to the fullest practicable extent, be treated for docketing, hearing, and determination as if the petition had been filed with the Court of Claims on the date the original claim was received by the Attorney General: * * *.
*151§1985. * * *
The Attorney General, in rendering an award in favor of any claimant, may as a part of the award determine and allow reasonable attorneys’ fees, which shall not exceed 10 per centum of the amount allowed, to be paid out of, but not in addition to, the amount of such award. *152Tract Forty-Four in Township Fourteen South of Range Fourteen East of the San Bernardino Meridian, California, containing Three Hundred Twenty Acres, according to the Official Plat of the Survey of said Land approved December 22,1908; being the land described as the South Half of Section Twenty-Five in Township Fourteen South of Range Fourteen East of the San Ber-nardino Meridian, California, containing Three Hundred Twenty Acres.
*1514. (a) Pursuant to the provisions of the Act set out in the preceding finding, plaintiff filed claim No. 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 1-A, dated December 27,1949, with the Attorney General, wherein she sought to recover approximately $50,075, representing damage to or loss of real and personal property which she allegedly suffered because of her evacuation and exclusion. Thereafter, she filed her petition in this court on February 20, 1958, claiming that her damage or loss amounted to $168,386.50. In her requested findings plaintiff reduces her claim to a total of $83,888.78. Two items of her claim consist of a 320-acre farm near Imperial, California, and a 160-acre farm at Niland, California, both of which properties lie in the Imperial Valley. In addition, the plaintiff seeks in her petition to recover the loss from forced sale or theft of certain farm equipment, automotive equipment, household furniture and rice seed, as well as crop losses (flax and barley) and loss from preparation of land for planting of rice and cantaloupes and for removal of rice levees, and loss occasioned by payment of extra attorney fees to one Boss T. Hickcox.1
(b) Plaintiff’s claimed losses were not of property vested in the United States pursuant to the Trading with the Enemy Act, nor did they arise from death, personal injury, personal inconvenience, physical hardship or mental suffering, and the plaintiff has received nothing from insurance to compensate her for her loss.
REALTY

The Imperial Property

5. On July 10, 1911, a patent was issued by the United States of America to George IT. Reed covering land described as follows:
*152Note that tract 44, which was the property transferred in the above patent and which property is referred to in this litigation as the Imperial property, was known prior to 1908 as the south half of section 25 under the Plat of Survey of 1856. This fact is basic to an understanding of a series of errors which persisted until 1942. By grant deed dated March 13, 1911, the above-described land was conveyed by George H. Reed to John C. Ralphs, Sr., and the deed was recorded on April 1,1911.2
6. (a) Subsequent to April 1,1911, Tom, who had entered the United States first in 1903 and had come to the Imperial Valley to live in 1905, farmed the land described in finding 5 under a rental arrangement with John C. Ralphs, Sr. Prior to July 1923 Tom and John C. Ralphs, Sr. discussed the possibility of the purchase by Tom of the land, which will hereinafter be referred to alternatively as tract 44 or the Imperial property or farm. However, the Alien Land Law of California in effect at that time precluded Tom from acquiring the land in his own name. Legal advisers suggested a circumvention of the law by conveyance of the property by John C. Ralphs, Sr. to his son, Charles B. Ralphs, who would execute a deed of trust to the property to his father to secure the transaction. Tom would then petition the California courts for leave to purchase the land in question for and on behalf of his minor daughter, Mary, the present plaintiff, who would assume the trust lien. Thereafter the property could be conveyed by Charles B. Ralphs to Mary through Tom as her guardian.3
*153(b) At this time (1923) John C. Ralphs, Sr. owned an additional 320 acres adjoining tract 44 on the south, and this was being farmed by his son, Charles B. Ralphs. John C. Ralphs, Sr. and another son, John C. Ralphs, Jr., lived in San Bernardino, California, during the times material herein, while Charles B. Ralphs lived on and operated the 320 acres in the Imperial Valley lying south of and adjacent to tract 44.
7. On July 25,1923, Tom filed a petition with the Superior Court of the State of California in and for the County of Imperial, as Mary’s guardian, for leave to purchase real property for Mary. The petition recited that the land was to be purchased from C. B. Ralphs for a total consideration of $48,000, payable in installments on or before certain dates set out therein. The copy of the petition in the record neglects to recite a description of the property, but other allegations in the petition conclusively indicate that the property consisted of 320 acres. Tom was represented in this proceeding by Attorney Randall. On August 15, 1923, an order was signed by the court granting leave to purchase the property described as:
South One-half (S%) of Tract Forty-four (44), Township Fourteen (14) South, Range Fourteen (14) East, S.B.B.M., Imperial County, California, containing 320 acres, more or less * * *.
Note the reference in the foregoing description to the south half of tract 44. This description represented the first of a series of errors, and is chargeable to Attorney Randall, since there were 320 acres in the whole of tract 44 but only 160 acres in the south half thereof. There were, of course, 320 acres in the south half of section 25, which had been the designation of tract 44 prior to the 1908 survey. The court’s order recited that the petitioner was to pay $6,400 upon the execution of the deed, and that the property was subject to a trust deed as a security for a promissory note in the sum of $41,600, payable in stipulated installments.
8. Attorney Hellyer represented the Ralphs in connection with the sale of the property to Mary. He prepared a deed from John C. Ralphs, Sr., and wife to Charles B. Ralphs, and a deed of trust from Charles B. Ralphs to a trustee with *154John C. Ralphs as beneficiary, in addition to a deed of trust note for $41,600, payable in stipulated installments. Both the deed and the deed of trust described the property involved in the transfers as the south half of tract 44. This description coincided with the description in the court’s order of August 15 entered pursuant to Tom’s petition to purchase the property, except no acreage was mentioned in the deed and deed of trust (finding 7, supra). The duly executed deed and deed of trust were recorded on August 9 and 27, 1923, respectively. Apparently there was no awareness on the part of the parties involved that the property thus deeded by John C. Ralphs, Sr. and his wife to Charles B. Ralphs represented only one-half of the entire tract 44, which the former had been deeded in 1911 by George H. Reed. The south half of section 25, as the property had been designated prior to the 1908 survey, had been erroneously translated by the lawyers into the south half of tract 44, whereas in reality it was the entire tract 44. This was the second major error in the series, and it is chargeable to Attorney Hellyer.
9. Attorney Hellyer was not satisfied with the petition which had been prepared by Attorney Randall and filed by Tom for leave to purchase the property for Mary, nor with the order entered by the court pursuant thereto, because of some ambiguity in describing the amount to be paid for the property. On September 11, 1923, Hellyer wrote to Tom’s attorney Randall, and enclosed a copy of a proposed amended petition and order. Simultaneously Hellyer prepared and sent to Charles B. Ralphs a deed to the property which was to be executed after the entry of an order under the amended petition. By this time Hellyer had apparently discovered that the original petition, the order thereto, and the deed and deed of trust between John C. Ralphs, Sr. and Charles B. Ralphs executed the preceding month had erroneously described the property as the south half of tract 44, for in the proposed amended petition and the proposed deed from Charles B. Ralphs and wife to Mary the property description correctly appeared as the whole of tract 44. In fact the draft of the proposed deed clearly refers to tract 44 as being “formerly known as the South Half of Section 25”. The amended petition erred (the third, by count) in reciting that the prop*155erty was subject to a deed of trust, for technically only the south half of the property described in the amended petition was so encumbered, namely, the deed of trust recorded August 27,1923, by Charles B. Ealphs for the benefit of John C. Ealphs, Sr. covering only the south half of tract 44. It surpasses understanding why Attorney Hellyer did not take immediate steps to correct the deed and deed of trust which had been recorded between the two Ealphs, since he must have known that the deed and deed of trust between the Ealphs applied only to the south half of tract 44. This was error number four, chargeable to Attorney Hellyer. It is reasonable to conclude that the deed and deed of trust between John C. Ealphs, Sr. and Charles B. Ealphs were intended to cover the whole of tract 44 containing 320 acres.
10. On or' about November 14, 1923, John C. Ealphs, Jr., who was a banker and therefore more conversant with such matters than either his father or his brother, Charles, prepared a letter for Charles to sign and deliver to the title company in El Centro with a signed deed to tract 44 executed by Charles B. Ealphs and wife to Mary, with instructions to the title company to deliver the deed to Mary or her guardian on payment of a certain sum of money to close the transaction. There is no proof that this letter was actually delivered by Charles B. Ealphs to the title company, but the letter does constitute evidence that as of that time the Ealphs intended to transfer the whole of tract 44 to Mary, and had overlooked the fact that Charles B. Ealphs had title from his father only to the south half of tract 44, while title to the north half of tract 44 remained technically in the father.
11. At about this time Tom apparently engaged other counsel to represent him in the proceeding, for Attorney Hickcox represented Tom in the preparation and filing on January 7, 1924, of a petition in the Superior Court to purchase land for Mary described as the north half of tract 44, consisting of 320 acres, at a price of $48,000 to be paid on terms to be arranged. This petition was granted by the court’s order dated January 18, 1924, which also described the property as the north half of tract 44. The misdescription in the petition and order was error number five and chargeable to Attorney Hickcox. Speculatively, he may *156have been trying to supplement the original petition and court order of August 1923 which applied to the purchase of only the south half of tract 41 (finding 7, sufra), but adding the two acreages together for the north and south halves of tract 44 would have given tract 44 a total of 640 acres, an absurdity which should have been plain on its face. Soon Attorney Hickcox became aware of his mistake and, by petition filed February 21, 1924, he procured an amended court order on February 29, 1924, which correctly described the property to be purchased by Tom for Mary as the whole of tract 44, but neither the new petition nor the order referred to the property as being subject to a deed of trust. Error number six, chargeable to Attorney Hickcox. Moreover, the petition and order last referred to continued to overlook the fact that Charles B. Ralphs had title only to the south half of tract 44.
12. In the meantime, by grant deed executed February 9, 1924, and recorded March 6,1924, Charles B. Ralphs and wife conveyed to Mary tract 44 “subject to a Trust Deed in the amount of $41,600, recorded in Book 1, Page 446 of Deeds, Records of Imperial County”. The trust deed in question was that referred to in finding 8, supra, executed by Charles B. Ralphs to the south half of tract 44 and recorded on August 27, 1923. In receiving the above deed, Tom, as guardian for Mary, did not sign a new note or a new deed of trust to secure the seller, but merely assumed the obligation executed by Charles B. Ralphs to Ms father. As mentioned in the footnote to finding 6(a), supra, this may have been due to the strictures of California’s Alien Land Law. The preparation of the deed granting to Mary more property than Charles B. Ralphs owned was error number seven, a reaffirmation of preceding errors, and chargeable to Attorneys Hell-yer and Hickcox.
13. The plaintiff maintains that, in the negotiations leading up to the February 9, 1924 deed of tract 44 to her, Tom asked John C. Ralphs, Sr. that only the south half of the property be subjected to a deed of trust encumbrance so that Tom would be able to secure credit on the unencumbered north half in order to have operating capital. The evidence of such an arrangement relies solely on Tom’s unsupported testimony *157of a private conversation he had with John C. Ralphs, Sr. in 1923, in the course of which Tom allegedly was given specific permission to keep the north half of the tract unencumbered so that he could raise money on it to grow cantaloupes, etc. Actually, Tom did not mortgage the north half but secured the necessary money for his farming operations by means of ordinary crop loans. Both John C. Ralphs, Jr. and Charles B. Ralphs testified that there was no such arrangement and at least the former was in a position to know. John C. Ralphs, Sr. was not available for testimony, having died in 1931. It is not reasonable to believe that the seller would have been content to benefit the buyer by restricting his security to only one-half of the property sold, especially where it must have been apparent contemporaneously that Tom would not need the north half unencumbered in order to raise operating capital, since he managed to borrow enough on loans against his crops. Mere friendly feeling by Ralphs, Sr. would not justify a supposition that the omission was deliberate. In view of the fact that even the title company and the attorneys for both parties during the months in question were apparently unaware that only the south half of the property conveyed to Mary was mortgaged, and were furthermore implicated in the series of errors which led to the conveyance to Mary by Charles B. Ralphs of the north half of tract 44 which he did not technically own, it is difficult to understand how an unlettered Japanese farmer like Tom could have perceived a flaw which eluded the professionals. It is apparent, however, that Tom was aware of the true situation at least as early as November 1940, when he had prepared for Mary’s signature an application to the Federal Land Bank for a loan on the technically unencumbered north half of the property and in listing liens made no reference to the Ralphs’ deed of trust on the form which Mary signed. It is concluded that the subjection of only the south half of tract 44 to the existing encumbrance at the time Mary received a grant deed purporting to convey the entire tract to her was the product of errors attributable to the attorneys handling the various transactions which have been related in the preceding findings, and was not the result of a private, intentional arrangement between Tom and John C. Ralphs, Sr.
*15814. Between. February 9,1924, and July 8,1940, payments totaling over $58,000 were made by Mary, or by Tom for her, on the principal and interest under the deed of trust note on tract 44 which reduced the principal to an agreed amount of $18,000 on the latter date. The deed of trust note contemplated complete payment by August 1,1929, but Tom was delinquent and made payments when it suited him. During the 1930’s taxes were delinquent at times on tract 44, but the delinquencies were cleared up.
15. Following the death in 1931 of John C. Ralphs, Sr., leaving seven heirs, repeated efforts were made by the heirs to get Tom to make payments on the deed of trust note. Charles B. Ralphs, who was one of the heirs but was also Tom’s neighbor and friend, interceded for him to prevent foreclosure.
16. (a) Because of the delinquency in payments on the deed of trust note, John C. Ralphs, Jr. and Charles B. Ralphs discussed the matter with Tom sometime in 1940. It was agreed that a security arrangement would be entered into regarding the agreed $18,000 balance remaining on the deed of trust note to which the grant deed of February 9, 1924 was subject. The payment terms were to be liberalized in order that they could be met by Tom. By July 1940 Mary was over 21 years of age. On July 8, 1940, Mary executed a deed of trust note and a deed of trust. The note read as follows in pertinent part:
$18,000.00 San Bernardino, California, July 8,1940
In installments as herein stated, for value received, I promise to pay to The Heirs and Devisees of John C. Ralphs, deceased, subject to the Administration of his estate, or order, at San Bernardino, California the sum of Eighteen Thousand and no/100-Dollars, with interest from date on unpaid principal at the rate of five per cent per annum, payable December 1st and May 1st of each year; principal payable in installments of Eight Hundred Thirty-three and 34/100-Dollars or-more on the 1st day of May and December each year, beginning on the 1st day of December, 1940, and continuing until said principal and interest have been paid. It is provided that if payments are made on principal and interest as set out above, credit of $1,000.00 will be given on the principal upon the making of each of said principal payments.
*159Tbe note was prepared on a form of the bank of which John C. Ralphs, Jr. was a vice-president.
(b) The deed of trust signed by Mary on July 8, 1940, to secure the above note was made out to a bank trustee for the benefit of the Heirs and Devisees of John C. Ralphs, Deceased, and the property covered by the deed of trust was described as the south half of tract 44. This constituted error number eight, merely a logical consummation of earlier errors, but chargeable to the Ralphs who should have known better. The deed of trust contained the same description as that in the original deed of trust note made out by Charles B. Ralphs and recorded August 27, 1923 (finding 8, supra), to which the grant deed of the property to Mary in February 1924 had been subject. The new deed of trust was recorded August 26, 1940. On September 4, 1940, the original deed of trust was released by the trustee to “the person or persons legally entitled thereto”, and the release was duly recorded.
17. On August 10, 1940, in connection with the foregoing transaction, the El Centro branch of the Pioneer Title Insurance and Trust Company wrote to Tom advising him that it had completed a title examination of the south half of tract 44. On August 26,1940, this company issued its policy of title insurance insuring the heirs and devisees of John C. Ralphs, deceased, that title to the south half of tract 44 was in Mary and listing liens and encumbrances, none of which are germane here. Since the title company was called upon to search only the title to the south half of tract 44, the property to which Mary’s new deed of trust related, it cannot be said that the title company committed an error on that occasion.
18. On September 6, 1940, the refinancing operation having been completed, John C. Ralphs, Jr. wrote to Tom enclosing a copy of the note and stating further:
I hope, Tom, that you will make every effort humanly possible to keep up with the payments as now written. I know you appreciate the treatment you have received. It has been rather hard for me to get everybody to agree to it, but we finally did.
19. The first payment under the July 8, 1940 note and deed of trust was due in December 1940 in the amount of *160$833.34. The first and only payment made on the note was $1,000 on April 25,1941.
20. (a) In the late 1930’s the soil in the Imperial Valley, including the tract 44 in suit, became increasingly alkaline, or salty, because the water used for irrigation was heavily alkaline and, as it evaporated from or filtered through the iri’igated land, left its salt mineral content suspended in the earth. A deep ditch had been dug through part of tract 44 by the Irrigation District to help alleviate the salt condition by attracting the flow of ground water which would leach out the salt, but this was effective in its purpose only within an area of 200 to 300 feet on either side of the ditch. By 1942 tract 44 and many farms in that area were so alkaline that there were many crops which could not be grown profitably, if at all. For example, lettuce, flax and cantaloupes are not salt tolerant and cannot be successfully cultivated in salty soil. Asparagus and barley are more tolerant to such conditions. High alkalinity reduces the yield of almost any crop in direct proportion to the relative salt-tolerance of the particular crop. The preferred way to reclaim highly alkaline farmland is to level it, install an elaborate network of drainage tiles, and to flood it with water so as to leach out the salt and drain it out of the soil. In 1942 tiling of land for drainage purposes was relatively new in the Imperial Valley. Another reclamation method is to plant a crop of rice which, because of the large quantities of water used, will in two or three years remove much of the salt and at the same time produce a money crop. By 1940 tract 44 had decreased in value because of its alkalinity and thus offered impaired security for outstanding encumbrances. As further evidence of this, in 1940 Mary applied to the Federal Land Bank for a loan of $4,900 on the north half of tract 44, and it was not granted because its alkaline condition had impaired marketability of the property. The soil conditions in the north half of tract 44 were superior to those in the south half.
(b) Tom had the entire tract 44 planted in asparagus for about 14 years preceding 1941. Asparagus is a perennial crop and will keep producing for as much as 25 years before playing out. By 1941 the alkaline condition of tract 44 *161had substantially curtailed the yield of Tom’s asparagus crop on tract 44 and so he plowed up almost all of it in the summer of 1941 with intention of eventually converting a great part of it to rice cultivation for soil restoration purposes. He reasoned that flooding the land for growing rice would rot the matted asparagus roots and convert them into useful fertilizer for the rice. As interim crops prior to actually building rice levees and sowing his rice Tom planted 40 acres to flax, 240 acres to barley, and two acres to tomatoes. This was done in 1941 with the idea that he could reap these harvests prior to the time for planting rice. In March and April 1942 these crops were in being on tract 44, interspersed with asparagus which, despite being plowed up, continued to push up through the stands of barley and flax. There is conflicting evidence as to whether Tom had built any rice levees on tract 44 or had any rice under cultivation there as of March 1942, but this is not material since there is no claim by plaintiff for loss of rice grown on tract 44.
(c) Tom was regarded as a capable and energetic farmer. In general, 1942 and the succeeding war years were prosperous years for Imperial Valley farmers, and most crops cultivated on suitable land were profitable. There was no grave shortage of farm labor in the Imperial Valley until the fall of 1942. The years 1948-1952 were the most prosperous years for Imperial Valley farmers since 1930.
21. Following the tragedy at Pearl Harbor on December 7,1941, public sentiment against persons of Japanese ancestry ran high in the Imperial Valley. Grounds existed for the plaintiff and her family to fear bodily harm. By March 2, 1942, the exclusion of persons of Japanese ancestry from Military Area No. 1, which included the Imperial Valley, was imminent.
22. On February 26, 1942, Mary executed an assignment to Charles B. Ralphs of 40 acres of flax and 240 acres of barley then growing on tract 44. On the same date Mary executed another assignment to Charles B. Ralphs of 80 acres of barley then growing on nearby rented land. On March 14, 1942, the District Attorney of Imperial County wrote the following letter to John C. Ralphs, Jr., as executor of the estate of J. C. Ralphs, Sr., deceased.
*162On examination of yonr questionnaire I find that you sold land in 1921 in the Imperial County to one Mary Sonoda, a minor, with Thomas Sonoda as guardian for said minor.
From the information given, I understand that the payments on this contract are several years in arrears and I suggest to you that at this time an effort be made to cancel this contract and secure the possession of the land for the estate. As you know, eventually all Japanese will be removed from Military Zone AI, which includes all of Imperial County.
Will you kindly advise me as to your attitude in this matter ?
23. On March 16, 1942, plaintiff made a will, witnessed by Ross Hickcox, her attorney, appointing Charles B. Ralphs as executor. On the same date the plaintiff executed a General Power of Attorney wherein she named Charles B. Ralphs as her attorney in fact to perform and carry out certain duties, obligations and responsibilities spelled out in the instrument, including the collection of moneys due, payment of debts, and to “farm for me, and in my name, place and stead [tract 44] * * * and to do everything needful and necessary to carry out my farming operations as he may deem best thereon.” Tom and Mary hoped that the property could be saved for their return from internment. Charles B. Ralphs accepted the power of attorney and subsequently paid many of Mary’s debts out of her account but did not make any payments on the deed of trust note against tract 44 which Mary had signed in 1940 as reported in finding 16, supra. Nor did Ralphs, so far as the record discloses, take any steps to operate the farm in the sense of planting additional crops as the existing crops were harvested so as to produce future income. However, he leased the property to one George H. Jones for one year starting July 1, 1942, as described in finding 31, infra. John C. Ralphs, Jr. had some hesitancy about his brother Charles serving as Mary’s attorney in fact, for on March 23 he wrote to Charles enclosing an opinion from a lawyer whose advice was that Charles should not accept the power of attorney because the fiduciary relationship it created between Charles and Mary would put him in an embarrassing position if Mary’s deed of trust, in which he had an *163interest, was foreclosed. For example, in the event of a foreclosure suit Charles B. Ealphs would be one of the plaintiffs, and theoretically if not actually might have also been named as a defendant in his capacity as attorney in fact for Mary. Ealphs himself consulted Attorney Whitelaw as to this problem of legal conflict. In his March 23 letter John C. Ealphs, Jr. also stated that the heirs had met and decided two days before to foreclose if Mary refused to execute a deed to the property and deposit it in escrow. From this letter and circumstances surrounding it, it is reasonable to conclude that there was no hope by the heirs that Mary would pay the note off, and that as of March 23, the date of the letter in question, it had not yet been discovered by the interested parties that the 1940 deed of trust covered only the south half of tract 44, or that Mary had an imperfect title to the north half. In spite of the advice given, Charles B. Ealphs functioned as Mary’s attorney in fact under the power of attorney on many subsequent occasions, including his signing as Mary’s attorney in fact a lease to tract 44 in June 1942 to George H. Jones for one year commencing July 1, 1942. It had apparently been discussed earlier that the property be sold to the said George II. Jones, for in June 1942 a sales agreement was drawn contemplating the sale to Jones by the estate (not Mary) of tract 44 for $18,000 provided the estate could convey a clear title within nine months. The proposed sales agreement recited that “Time is of the essence of this contract.” Quite clearly the as-yet-undiscovered errors in the title and deed of trust had nothing to do with initiating the decision of the heirs to foreclose on the deed of trust. Discovery of the errors referred to came about by reason of the facts related in the following finding.
24. (a) Prior to January 1942 the plaintiff borrowed approximately $2,328.92 from several produce companies, giving as security the tomato crop under cultivation at the Niland farm. The tomatoes were to be shipped to the produce companies which were to deduct from the sales proceeds of the tomatoes shipped the amount of the indebtedness and remit the balance, if any, to the Sonodas. The papers representing these crop loans were sold at a discount to one Ben *164Hayfer. On March 6,1942, the loans having become overdue, Hayfer filed suit in the Superior Court of California, County of Los Angeles, to recover the sum of $2,328.92, plus interest. On March 18, 1942, the day after Tom’s arrest and internment, Hayfer filed an attachment against Mary’s bank accounts and on all of tract 44. Subsequently Mary satisfied Hayfer’s claim and the attachments were released.
(b) The Hayfer attachment proceedings brought to light the misdescription of tract 44 in certain instruments, which error had persisted without knowledge by the Ralphs from 1923 to 1942. Sometime after March 23 and before March 26, 1942, the Ralphs discovered the errors. Obviously Tom had known something about the errors at least as early as November 1940 when he had applied in Mary’s name to the Federal Land Bank for a loan on the north half of tract 44 (findings 13 and 20, supra), but Mary did not share Tom’s knowledge of this matter. Prior to the discovery of the errors by the Ralphs they had thought mistakenly that the entire 320 acres of tract 44 were covered by the 1923 and 1940 deeds of trust, instead of only the south half of tract 44. They had also thought that title to the north half of tract 44 was in Mary. Continuously from 1924 the north and south halves of the tract had been assessed separately in Mary’s name by the Imperial Irrigation District for tax purposes. Prior to 1924 it was assessed to the then owner as a single tract of 320 acres.
25. Upon discovery of the errors as related in the preceding finding, the Ralphs, their attorney, Dorsey Whitelaw, and the El Centro Branch of the Pioneer Insurance and Title Company developed a plan to file a suit immediately for reformation of the 1940 trust deed, and then confer with Mary and her counsel in order to persuade her to execute voluntarily a correction of the 1940 trust deed to subject the entire tract 44 to its provisions. The plan also contemplated perfecting Mary’s title to the property by having the Ralphs heirs deed the north half of tract 44 to her. The title company suggested that “nothing be said to the Sonodas until the suit had been filed, so as to prevent any possible complications in case the Sonodas were not willing to cooperate in the adjustment.” Discovery of the errors by the Ralphs had *165hardened their attitudes towards Tom, who they believed had known the true facts all along and had sought to benefit by keeping quiet. Charles B. Ralphs, who had theretofore always interposed objections when the other heirs wanted to deal firmly with Tom about his delinquencies in payments, no longer objected to foreclosure, although he would probably have let the matter drift along had it not been for the discovery of what he considered to be deceptive conduct on Tom’s part in concealing significant facts.4 Immediately prior to learning of the errors in the deed and deed of trust, the Ralphs heirs had decided to foreclose anyway on the trust if Mary refused to voluntarily surrender her title, but discovery of the errors made the idea of foreclosure less distasteful and morally more justifiable in their view. Furthermore, Tom’s absence due to his arrest and confinement, and the lack of any effective representation of his views by either Mary or counsel, naturally created a vacuum which provided no resistance to the Ralphs’ aims.
26. On March 27, 1942, a suit was filed against the plaintiff and Ben Hayfer (the latter still having an attachment lien on the property) by Charles B. Ralphs and John C. Ralphs as executors of their father’s estate, for reformation of the 1940 trust deed to reflect that all 320 acres of the entire tract 44 were to be covered thereby instead of just the south half. The complaint stated in part that the 1940 trust deed, “through mutual mistake of parties, did not express their true intention, in that it was intended by them that said trust deed should convey to said trustee, for the trusts and purposes therein set forth, all of said tract 44 in Township 14 South, Range 14 East, S.B.B. & M., whereas in fact said trust deed executed as aforesaid conveyed as hereinabove set forth only the South Half of said Tract 44. * * * Said mistake was not discovered by plaintiffs or either of them until the week just *166past.” 5 • Summons was served on Mary by her attorney in fact, Ciarles B. Ralphs, wbo was also one of tbe plaintiffs suing her.
27. On March 28,1942, Charles B. Balphs called on Mary at her home on the Imperial farm for the purpose of getting her to sign a new deed of trust to the north half of tract 44. The document contained the following recitation:
This Trust Deed is executed to carry into effect the intent of the parties on July 8,1940, when the Trust Deed recorded in Book 555, page 382 of Official Records of Imperial County was executed, that said Trust Deed should cover all of said Tract 44, Township 14 South, Range 14 East, S.B.M., and which intent was not accomplished by reason of mutual mistake and misunderstanding by the parties thereto.
On this occasion Ralphs, who was Mary’s neighbor and friend of long standing, as well as her attorney in fact, appeared to Mary as being upset and agitated in describing to her the error which necessitated the execution of the new deed of trust. She did not comprehend the tangled factual situation and telephoned her attorney, Hickcox, for advice. Hickcox had i’epresented her in the original acquisition of the property and had participated in the early series of errors (finding 11, supra). Mary felt that Hickcox was reluctant at the time to be too helpful to her because community feeling was so strong against the Japanese that many people refused to admit that they knew any Japanese, and being friendly to them could affect the individual adversely in his community standing. Upon being asked by Mary for his advice Hickcox replied to the effect “Under the circumstances what else can you do but sign the document ? ” Tom had been interned and was not available for consultation, and neither Ralphs nor Hickcox suggested to Mary that she should consult Tom. Thereupon, Mary signed the deed of trust. Curiously, it was not until sometime later that the heirs deeded to Mary the formal title to the north half of tract 44, so as to make her *167deed and deed of trust coextensive. The facts related in the following finding reflect Mary’s mental and emotional condition at the time she signed the deed of trust, and explain why she was willing to do almost anything she was asked to do in order to avoid difficulties.
28. Mary had left home to go to school at the age of 16 and had been away from home for virtually all of the 12 years preceding 1942, except for brief visits at Christmas and during vacations. She was an exceptional student. At college (including post-graduate studies in pre-war Japan) she majored in foreign trade, which included some courses in commercial law, although she acquired only a surface understanding of real estate deeds, mortgages, and the like. She knew nothing about farming and depended on others to operate the farms which were in her name. Farm management was not uncommon in the Imperial Valley. Mary was still living in Los Angeles during the first few months of World War II and did not come home to the farm until a few days after Tom was arrested on March 17,1942. Prevailing anti-Japanese sentiment in the Imperial Valley was emotionally and physically upsetting to Mary on her return. A Japanese couple in the community had been murdered the previous New Years Eve. There was talk of vigilantes and reprisals, and Mary lived in continuous fear of safety for herself, her mother, and her two sisters with whom she was living. On March 21 a curfew was decreed requiring all persons of Japanese ancestry to be home from sundown to sunup, and restricting their travel to within a ten-mile radius of their homes.6
29. As of May 1942 Mary owed about $18,632.54 on the July 1940 deed of trust note she had signed. As of March or April 1942 she had used her small available funds to pay outstanding bills and was in no position then to make any payments against the trust note. On May 22,1942, Charles B. Ralphs opened a bank account in his name as trustee for *168Mary, in which he deposited funds and made disbursements in Mary’s behalf until March 20,1943, pursuant to the power of attorney which he held. Throughout the life of this account there were total deposits of $8,430.54 and total disbursements of $8,258.61, including $2,000 transferred on February 17,1943, to Mary’s account elsewhere, which $2,000 was used by Mary to pay dental and clothing bills for the family and to help Tom get started again in a small farming operation near Denver, Colorado. In addition, the sale of various items of personal property netted Mary $424.25 in June 1943. It is plaintiff’s contention that Charles B. Ralphs thus had funds in his control belonging to her which he could have used to make the necessary payments on the trust note to avoid foreclosure, but which he used instead to pay other less necessary obligations so that delinquencies under the note would continue and would thus validate and compel a foreclosure. There is no record that Mary had ever given specific instructions to Charles B. Ralphs with reference to using her bank account to defray the 1940 note, although in some instances she had given him instructions to pay certain other bills. Whatever receipts there were from the farm went to paying bills. Mary received no money herself from the farm during her internment except for the $2,000 mentioned above. While interned she was paid $16 per month from the relocation authorities in payment for services rendered them. The Ralphs did not ask Mary or Tom to make payments on the note at any time after Tom was arrested in March 1942, for obvious reasons. The evidence does not establish that Charles B. Ralphs failed to account properly for Mary’s income in his custody during the period of his stewardship, or that he expended any of Mary’s funds needlessly or illegally. If he had applied all of her funds to the deed of trust note on the property he would not have been able to meet other urgent obligations incident to the operation of the farm. But the record also does not reflect any receipts by Charles B. Ralphs on Mary’s behalf after June 20, 1942 (except an unexplained $50.71 in November 1942), even though the property was rented to a tenant for one year commencing July 1, 1942, as stated *169in finding 31, mfm. If the tenant paid any rent to Ralphs on Mary’s behalf it is not accounted for.7
30. On July 20, 1942, Attorney Hickcox advised Mary by letter as follows:
Mr. Ralphs was in Saturday and gave me the barley sales as $8376.83 and the expenses $4193.00 with 2 checks he did not have which will probably be $200.00 or $300.00 more. The money will be distributed according to your desires and you better make out a list and send it to me of those you want paid first. I will expect some recom-pensation of about $200.00 out of this money. _
_ I am very much alarmed that Ralphs is going to foreclose on your place. He told me there was $18,000 due on it which they figure is about the value of the place. He is renting it for this coming crop year for flax on a ^4 rental basis. He claims he is quite exercised at your father for the way your father nonchallantly spent the money for other things instead of paying off the ranch as he should have done. There is some truth in this matter. I am trying to put off the evil day and. I think the best thing you can do, if we can get a buyer, is to sell the property and I believe this can be done so that at least some money can be saved. Ordinarily, you might perhaps get a loan, but under the circumstances you can not secure a loan for yourself. The situation is very unpleasant and makes me feel very unhappy. I am sending a copy of this letter to your father at Santa Fe.
No reply to this letter is in the record.
31. Tract 44 was leased for one year starting July 1,1942, to George H. Jones under an arrangement whereby Jones was to pay as rent a percentage of the flax grain and straw he was to grow on the property. The record does not reveal any further information regarding performance under the terms of this lease, including accounting for rental proceeds.
32. On August 28,1942, a Petition for Distribution of the Estate of John C. Ralphs, Sr., Deceased, was filed with the Superior Court, County of San Bernardino, State of California, by the executors of the said estate. The petition recited the fact that the estate had remained open since 1932; *170that certain of the original heirs and a co-executor had died and that the estates of the said original heirs and co-executor represented the interests thereof in the estate of John C. Balphs, Sr., and that the heirs and devisees of said John C. Balphs, Sr., or their representatives, had agreed that each and every one of them should receive an undivided one-seventh interest in and to the estate. One of the assets of the estate which was subject to distribution was Mary’s delinquent deed of trust note in the face amount of $18,000. On September 14, 1942, a decree of distribution was signed by the court. This decree provided, inter alia, that each of the seven individuals named therein was entitled to an undivided one-seventh interest in Mary’s deed of trust note and in the other estate assets. John C. Balphs, Jr. and Charles B. Balphs were listed among those so entitled to share in the distribution.
33. On September 28, 1942, the heirs and devisees of the estate of John C. Balphs, Sr., deceased, recorded a Notice of Default under Mary’s deeds of trust executed on July 8,1940, and March 28,1942, to secure the payment of her 1940 deed of trust note on tract 44.
34. On October 27, 1942, Tom wrote the following letter to Mary from his place of internment at the Lordsburg Internment Camp in New Mexico:
Dear Mart Taki SoNoda:
Deceived your air mailed letter of the Oct 23rd regard the property enclosed with a letter from Evacuee property Division and I do not surprise what he said about after his investigation and his up raised price provably is right. At this confused wartime, your property will produce more than its value if I run myself, but for the sales I am afraid to get what Mr. Hickcox mentioned sometime ago, Mary-I do wish you would write to Pioneer Title & Insurance Co at San Bernadino to send you a copy of agreement we drawn few years ago, signed by you and I endorsed for payment that agreement made for note from the principal $1600000 and payable in eight years, $100000 semi annualy-also stipulated and allowed $200000 discount, that means if I keep up paying $166666 a year my obligation fullfild. Also I remind you, this is very important, that south y2 160 acres has been covera for mortagage in other words $1600000 secured by mort-*171agage with, south y2 160 acres and north. % 160 acres free from encumbrance. So you explain to your attorney Mr. Haas without fail or you may let him read this letter. About this north y2 160 acres has been free from encumbrance ever since the deal started 18 years ago. John C. Ralphs, deceased gave you grand deed when I paid $1280000 at 1923. All those grand deed & note has been recorded at recorders office at El Centro County Court or as well as at San Bernadino by the Pioneer Title Insurance Co. and when we drawn new note few years ago, the north y2 was free from the encumbrance too. If Mr. Ralphs forced you to sign new note after I am interned for whole 320 acres to secure the balance, we can prove the faulty because north y2 160 acres stand free from encumbrance ever since the cleal started. Please let your attorney investigate at once, by the meantime I do wish you would write to Mr. Ralphs to reconcider to give us fare chance, paying off Miss Rhoad money $160000 for 1942 and 1943 payment out of crop which will be ready by early summer of 1943. George Jhons farming by share crop agreement. If Ralphs says no then you may prepare for legal action you will save north y2 160 acres at any rate, circumstance, off corn’s you loose house provably shed but better than loose all. You may write to real estate men as you said in your letter however you con-soult with your attorney. Not before you get answer from Ralphs. I received package of soda thank you million, this letter I obtained special permite for strictly business letter. So I will write to Louise again thank you for her letter which received today.
Your daddy,
Tomoji SONODA.
Attorney Haas mentioned by Tom in the foregoing letter was an attorney in the Legal Aid Division of the Poston Relocation Center where Mary was interned. Tom never received a reply to this letter. During October 1942 Mary, then interned, had been trying to make inquiries as to the present and future value of tract 44 through the help of officials at the relocation center.
35. On December 31, 1942, Attorney Hickcox wrote Mary advising her that he had just learned that tract 44 was to be sold at foreclosure on January 25, 1943. At the time of writing this Hickcox had not heard from Mary for two months and did not know Tom’s address. On January 4, *1721943, Hickcox again wrote to Mary enclosing a Notice of Trustee’s Sale, dated December 30, 1942, announcing that tract 44 was to be sold for note default on January 25,1943. On January 25, 1943, at the Trustee’s Sale, tract 44 was offered for sale at public auction. There were no bidders and so the distributees of the Ralphs’ estate bought in the property for $18,000, the face amount of the note. The note was then canceled, the trustee executed a trustee’s deed on January 25, 1943, to the distributees, and it was recorded on March 30, 1943. In September 1943, the distributees sold the entire tract 44 to one William A. Fifield for $18,000. Fifield managed to keep the farm going despite its condition. He did not install tiling for drainage until 1948.
36. The fair market value of tract 44 in May 1942 was $24,550,8 consisting of $13,050 for the north half and $11,500 for the south half. As of July 1948 the fair market value of tract 44 (without capital improvements of $9,800 added by its then owner) was $35,000, of which $18,600 represents the fair market value of the north half of the tract. As of January 1950 the fair market value of tract 44 was $56,000, including $18,800 in capital improvements installed by its then owner.
37. As of May 1, 1942, the indebtedness on Mary’s 1940 note, including both principal and interest, was $18,632.54, with consideration being given to the payment of $1,000 by Mary on April 25, 1941. As of January 25, 1943, the interest and principal due on the note totaled $19,323.10.
38. In reducing the original purchase price of $48,000 for tract 44 down to the agreed balance of $18,000 on July 8,1940, the plaintiff had made total payments to the latter date of $58,148, including both principal and interest. The $1,000 payment made by plaintiff on April 25, 1941, increased her total payments on the property to $59,148.
39. Tom and Mary had complete faith in Charles B. Ralphs as a neighbor and friend of many years in Imperial County, and he undertook to discharge his duties under the assignments and power of attorney referred to in findings *17322 and 23, supra. Accordingly, Ralphs, in Mary’s behalf, harvested crops, sold them, collected proceeds, deducted expenses, and rendered an accounting to the plaintiff. He followed whatever instructions Mary gave him, but there is little record of any specific instructions which she gave. It is evident that she was relying on Charles B. Ralphs and Hickcox to protect her interests and do what had to be done. Ralphs was completely relieved of his responsibilities to Mary by June 26,1943. Thereafter, Mary wrote and thanked him for his troubles on her behalf, and as payment for his services gave him an old pick-up truck.
THE NILAND PROPERTY
40. On April 9, 1935, Tom purchased for $100 an option to buy a 160-acre farm at Niland, Imperial County, California, described as follows:
South half of Southeast quarter; Northeast quarter of Southeast quarter and the Southeast quarter of the Northeast quarter of Section 12, T. 10 S., R. 13 E., S.B.M.
The purchase price was $4,000, of which $1,900 was to be paid in cash on April 22, 1935. A first mortgage note was to be given in the amount of $1,400, payable in the following installments:
$400 by-May 1,1936
$500 by-May 1,1937
$500 by_May 1,1938
A second mortgage note was to be given in the amount of $600 on that portion of the land lying east of the East High Line canal, which represented about 17 of the 40 acres in the southeast quarter of the northeast quarter of section 12. The second mortgage was payable on May 1, 1938. A quitclaim deed to the entire 160-acre tract was to be delivered to Tom by Albert S. Cox on April 22,1935, together with a certificate from the United States Land Office and another certificate from the Imperial Irrigation District showing all assessments levied had been paid except the payment becoming due June 30,1935.
41. The property was deeded to Mary, who presumably paid the required downpayment in cash. The mortgage arrangements were altered as shown in this and the succeeding *174finding. On October 15, 1935, Mary executed a mortgage to Albert S. Cox upon approximately 57 acres of the Niland property, described as follows:
The Southwest Quarter of the Southeast Quarter and that portion of the South half of the Southeast Quarter of the Northeast Quarter, lying East of the East High-line Canal, all in Section Twelve (12) Township Ten (10) South, Eange Thirteen (13) East, S.B.M.
The mortgage secured three promissory notes providing as follows:

Interest Due date Amount Percent

May 1, 1936_$200 6
May 1, 1937_ 250 6
May 1, 1938_ 550 6
Subsequently, the May 1, 1936 and May 1, 1937 notes were paid. On May 26, 1936, the note due May 1, 1938, was endorsed over to W. A. Scheniman and wife. No payments had been made on the May 1, 1938 note by April 17, 1942, as of which latter date the principal and accumulated interest (without compounding) on the note totaled $764.64. On April 17,1942, Mary, with the advice of her attorney Hick-cox, executed a deed to the property covered by the mortgage to W. A. Scheniman, in full satisfaction of the overdue mortgage note. The property thus deeded was worth about $2,500 at that time. Despite the fact that the deed to Scheni-man was purportedly in satisfaction of the entire note, in February 1943 Scheniman leased 40 acres of the land to one Paieri for $350 and applied that amount against the note in question. The record provides no satisfactory explanation of this apparent inconsistency.
42. On October 15,1935, Mary executed an additional mortgage to one V. J. Welcome upon approximately 103 acres of the Niland property, described as follows:
The East half of the Southeast Quarter and the Southeast Quarter of the Northeast Quarter, excepting from said Southeast Quarter of the Northeast Quarter that portion of the South Half thereof lying East of East Highline canal, all in Section Twelve (12), Township Ten (10) South, Eange Thirteen (13) East, S.B.M.
*175The mortgage was security for Mary’s three promissory notes to Welcome, the first of which was for $200 due May 1, 1936, the second for $250 due May 1, 1937, and the third for $550 due May 1, 1938, all at 6 percent interest per an-num. Subsequently the first and second notes were paid. As of April 28, 1942, Mary owed Welcome $488.37 on the third note. On that date Welcome filed suit to foreclose, but the record does not disclose the outcome of the suit. Nor does the record disclose whether the Welcome note was ever paid.
43. (a) Mary was not only delinquent in the payment of her mortgage notes on the Niland property, but was also delinquent in the payment of taxes to the Imperial County and the Imperial Irrigation District. The evidence of record as to tax sales, tax titles, foreclosures, quitclaims, quiet title actions, and sales is inconsistent and incomplete, but supplying reasonable conclusions to bridge notable gaps and resolve contradictions in the evidence, this is approximately what happened:
(b) In April 1942 Mary was behind in her mortgage payments as well as her taxes, so Welcome filed foreclosure proceedings against 103 acres of the property, and Mary deeded to Scheniman the remaining 57 acres in satisfaction of the mortgage held by him. Assuming that the foreclosure proceeding vested title to 103 acres in Welcome, it then appears that Scheniman and Welcome failed to pay their taxes. Both the Irrigation District and the County obtained tax titles at tax sales for delinquent taxes accruing prior to 1942. The Irrigation District decided to obtain a fee simple title to the entire 160-acre property, and in January 1948 it filed a suit to quiet title against Welcome, Scheniman, and others. During the pendency of the suit the Irrigation District obtained a quitclaim deed from Scheniman covering 57 acres, cleared the County tax liens on the entire 160 acres, and sold 23 acres outright to an unnamed purchaser. In October 1950 the court entered a decree in the quiet title action which effected a fee simple title in the Irrigation District to the entire 160 acres. Having already sold 23 acres, in March *1761951 the Irrigation District sold the remaining 137 acres to a private purchaser for about $1,595.9
44 It was stipulated by the parties that:
(a) As of May 9,1942, Mary owed the Irrigation District and Imperial County taxes in the respective amounts of $261.75 and $109.26.
(b) On February 8,1949, Mary would have been permitted to reacquire title to the Niland farm in its entirety through the payment of approximately $3,000 in back taxes, interest and penalties owing to the Irrigation District and Imperial County.
(c) On March 20, 1951, plaintiff would have been permitted to reacquire title to all but 23 acres of the Niland farm through the payment of approximately $3,000 in full satisfaction of all back taxes, interest and penalties owing to the Irrigation District and Imperial County. It was the policy of the taxing authorities in question to permit the former owner to redeem property even after the statutory right of redemption had ceased, upon payment of the delinquent assessments, plus penalties and interest. Actually, however, in 1949 and 1951 Mary would have been in precisely the same position as any other prospective purchaser of the property from the Irrigation District, that is, the Irrigation District would sell the property to the one who offered the most, whether it was more or less than the delinquent taxes. Even if Mary had been able to pay $3,000 in 1950 to redeem the property she would not have had sufficient capital available to resume farming there.
45. It was stipulated that the fair market value of the Niland property was $8,250 in 1942-1943, $15,300 in July 1948, and $19,000 in January 1950. The 1942-1943 valuation is subject to reduction by $1,350 for the unpaid balances of the Cox (Scheniman) and Welcome mortgages.
*177PERSONALTT AND MISCELLANEOUS CLAIMS
46. (a) After the internment and evaculation of Tom and Mary in March and May 1942, respectively, C. B. Balphs, acting under the assignments and power of attorney described in findings 22 and 23, supra, supervised the harvesting of crops then in being and collected the sum of $8,430.54 from sales of flax and barley, which it was agreed was the fair market value of those crops. As Mary’s agent, C. B. Balphs paid bills incident to his stewardship of Mary’s interests. Included among the bills so paid relating to tract 44 were County and Irrigation District taxes for the last half of 1941 in the respective amounts of $238.20 and $842.75, and $1,630 to Esther Bhoads to repay a loan of cash to Mary which had been used by Mary to release the Hayfer attachment lien on tract 44 described in finding 24, supra. Mary contends that C. B. Balphs violated his fiduciary relationship with her by paying taxes and other bills relating to the property when he, as one of the heirs of his father’s estate, had agreed with his co-heirs to foreclose on the deed of trust note against the property. As to the payment of the $1,630 to Esther Bhoads, which was done by C. B. Balphs on Mary’s instructions in partial repayment of Bhoads’ loan of $2,000 to Mary, Mary contends, but has failed to establish, that the note which she used the borrowed $2,000 to defray had already been satisfied by the shipment of tomatoes to the payee, and thus that her evacuation was in some way the cause of the double payment. It is concluded from the record that the original note obligation was not satisfied by shipment of tomatoes, and that the payment of the $1,630 indebtedness to Esther Bhoads was made at Mary’s direction and in her interests.
(b) In her administrative claim and in her instant petition Mary claims further that Tom’s absence resulted in an increase in the costs of harvesting, but this claim is not made in the plaintiff’s request for findings and so is not reported on here, although parts of the record as well as common sense would indicate that the observation is generally sound.

*178
Furniture and, personalty

47. It was stipulated by the parties that, as a result of her evacuation and exclusion from the Imperial Valley in May 1942 Mary incurred losses totaling $5,837.50 for household furnishings, farm equipment, rice seed and motor vehicles, and the defendant concedes that she is entitled to recover the same.
Attorney's fees — Ross T. Hichcox
48. Eoss T. Hickcox, an attorney in Brawley, California, had represented the Sonodas in legal matters from 1924 until at least early 1943. From 1934 through 1940 he received fees from the Sonodas ranging from $70 to $300 a year. He is since deceased. Following Mary’s evacuation from Imperial County Hickcox continued to handle legal affairs for the Sonodas, and Tom had instructed Mary to consult Hickcox whenever she needed legal advice. On July 20,1942, Hickcox wrote to Mary requesting instructions as to the distribution of certain moneys which had been collected for her by C. B. Ealphs, stating that “I will expect some recompensation of about $200 out of this money.” There is no record of Mary or Tom having paid this to Hickcox.
49. (a) Mary received a letter dated December 12, 1942, from the Imperial Valley Asparagus Growers’ Association stating in part as follows:
At a meeting of the remaining members of the Association held on December 11th it was decided to refund in full the property rights of members who have had no asparagus shipments since the close of the last Fiscal year, May 31, 1942, and whose asparagus fields have been plowed under. This included yourself and we have paid to Eoss T. Hickcox the sum of $1,919.85 which was the amount of your equity balance as of May 31st and which you assigned to Mr. Hickcox as of March 16th.
There is no other evidence in the record of the assignment to Hickcox referred to in the preceding quotation. But on the day mentioned, March 16, 1942, Mary made an assignment to C. B. Ealphs of a stand of ‘barley, and on February 26, 1942, she executed another assignment to Ealphs covering other stands of flax and barley (finding 22, supra). These two assignments covered about all of the flax and *179barley that Mary is known to have had, and it is unlikely that she would have executed an assignment to Hickcox duplicating or overlapping the assignments to Ealphs, especially since Hickcox was Mary’s attorney at the time and probably prepared the Ealphs’ assignments for her signature. It is more likely that the author of the letter from the Asparagus Growers’ Association made a simple mistake in reference.
(b) By letter dated December 31, 1942, Hickcox advised Mary in part as follows:
I collected $1919.85 from the Asp. Growers Assn, and applied it to your guardian account as instructed. This still leaves a balance due in that account and also in the account of your sister’s guardian account. However, I am willing to rebate the balance in both of these accounts. I am mailing a copy of this letter to your father as soon as you send me his address.
There is no evidence as to what guardian account was involved in the foregoing letter, or how much was in that account.
50. Mary contends that she never received the $1,919.85 discussed in the preceding finding and that, accordingly, Hickcox appropriated this money for his own use. In the administrative presentation of her claim she alleged that Hickcox had credited the sum as payment on a bill for services rendered her father as her guardian as well as the guardian of her sisters. She further stated that she never received a statement of the amount of the fee and if anything was due Hickcox it was for services he rendered her father. In short, her complaint was that Hickcox paid her father’s bills out of her “estate”. There is no evidence that Mary or Tom ever sought an accounting from Hickcox or that they ever protested to Hickcox about this matter. The evidence that is available (finding 49(b), supra), infers that Hickcox deposited this money in some guardianship account for Mary or her sisters, as Mary had instructed him to do, and distributed the funds only as instructed by Mary. There is insufficient evidence to warrant the finding that Hickcox utilized these funds for his personal use or for payment for services rendered by him on behalf of the Sonodas. The inference is warranted by the record that Hickcox ren*180dered legal services (of questionable value and quality, it is true) for the plaintiff subsequent to April 12, 1940, without compensation, on the basis of his long association with the Sonodas.
Preparation of La/nd for Bice — Removal of Levees
51. On or about May 1,1941, Tom, through a “strawman”, leased certain land for a seven-month period from one John Hancock for a rental of $250. The lease recited that the premises were leased for the purpose of growing and producing a crop of rice on the entire property. The lease was to expire November 30, 1941. The property was in poor condition due to excessive alkali content and it was thought that the large quantities of water used in rice cultivation would help leach out the salt and reclaim the soil. To the extent that rice cultivation had been practiced in the Imperial Valley up through 1942, it was indicated that its chief object was to help reclaim and restore the soil rather than produce a profitable rice crop. Water for rice cultivation was available at a reduced rate because it benefited the soil. Rice had not flourished in that area and it was a comparatively expensive crop to cultivate due to the necessity of building levees to impound the water, installation of tiling, necessity of controlling damage from wild ducks attracted to the rice and the water, and the expense of special harvesting machines which could operate in the muddy soil after the water was drained off.
52. Tom also entered into another agreement orally for the leasing at a nominal $1 rent of a nearby tract of 160 acres of virgin land for two years commencing May 1, 1941, on part of which he made preparation in early 1941 for the planting of rice as well as barley. By December 7,1941, the harvesting of rice on the Hancock property referred to in finding 51, supra (or it may be the other location, there being some confusion) was about finished and the threshing was about to start, but the war conditions interfered with the hiring of labor for threshing. No doubt these conditions applied to both properties equally. Tom had to remove the levees from the Hancock property because the lease had expired. Tom’s total expenses in 1941 in connection with rice *181cultivation were at least $2,881.10, consisting of $250 for renting the Hancock property, $250 for removing the levees from that property, and $1,669.27 in preparing the virgin land for planting rice. Mary received $3,100 in late 1941 and $2,340.55 on February 5, 1942 (total — $5,440.55) from sales of rice grown on the properties in question. Mary claims that her loss of $2,281.10 for preparation of the properties for rice cultivation was attributable to the evacuation. She does not credit her sales proceeds against her costs in calculating her alleged loss, so apparently regards this in the nature of a capital investment which it was contemplated would enable her to cultivate recurring crops of rice, although it is obvious that at least the $250 cost of removing the levees on the Hancock property was incurred as the result of the expiration of the lease. Since Tom undertook to grow rice on rented property, as described, it is clear that his prime object was profit rather than soil restoration, which latter might have been the case if he had grown it on property which he or Mary owned.

The Hayfer-Bhoads Tramaotion.

53. The matter giving rise to the Hayfer attachment on Mary’s tract 44 (the Imperial farm) was discussed in finding 24, sufra. To repeat Tom was advanced a total of $2,328.92 by three produce dealers in Los Angeles, on the security of the tomato crop then under cultivation at the Niland farm. The sales prices of the tomatoes shipped to the dealers were to be credited against the advances until they were liquidated, and any credit excess was to be paid to Mary. The obligations, which were open book accounts (probably secured by non-interest bearing notes), matured on three different dates between January 24 and February 24,1942, and were not paid. The papers were discounted to one Ben Hayfer, trading as the Ace Credit Exchange, and he brought suit against Mary on March 6,1942, for the total of $2,328.92, and undertook attachment proceedings to satisfy the claim against tract 44 and Mary’s two bank accounts, distraining $647.74 in the latter from mid-March until April 17, 1942. During the pendency of the proceedings Mary borrowed $2,000 from a friend, Esther Rhoads. Hayfer was paid off and, on April 20, 1942, dismissed the court action. Charles *182B. Ralphs repaid Mary’s debt to Esther Rhoads by check for $1,630 in December 1942 plus some personal property. Mary contends that the produce dealers in Los Angeles who were the original creditors who assigned their claims to Hayfer had been paid off earlier hi whole or in part by the shipment of tomatoes from Niland, and in paying Hayfer to dismiss the suit she, in effect, paid the same obligation twice. She attributes this to her evacuation, but the payment to Hayfer preceded her evacuation by one month and she was represented by counsel (Hickcox) in the Hayfer proceedings. Furthermore, it is unlikely that Tom had shipped more than a few tomatoes for the reasons described in finding 54, infra. This claim was not presented to the Attorney General in the course of administrative proceedings, nor in the petition in the instant case. However, proof was taken at trial and, in her requested findings, the plaintiff claims to have lost $370 in the transaction, apparently on the theory that the $2,000 loaned by Rhoads in March or April 1942 was paid off by Ralphs for Mary in December 1942 for $1,630, and Ralphs has not accounted for the $370 difference. Since Ralphs did not handle the original $2,000 loan by Rhoads, he cannot be charged with accounting for the difference. The $1,630 which Ralphs paid to Rhoads in December by check against Mary’s account was paid out of deposits credited to that account by the sales of crops, etc.

Tomatoes

54. In late 1941 Tom was cultivating 15 acres of tomatoes on the Niland farm and two acres on tract 44. Tomatoes were grown at Niland as an off-season crop whose profitability ended about the time when seasonal tomatoes from other locations came into the market at lower prices. The maximum tomato harvesting period at Niland extended from Thanksgiving to the first of the following April, but four-fifths of the crop was usually harvested prior to mid-March. The outbreak of war on December 7,1941, created a shortage of Japanese farmhands whose services were necessary for the more skilled operations of sorting and packing, and consequently Tom was able to harvest only about one-third of his tomato crop at Niland, the balance being allowed to die *183on the vine. Market conditions for tomatoes from the Niland area were depressed in the first quarter of 1942. It was also a poor year for tomatoes in that area. Tom feared that he would be charged by the Government with sabotage of food supplies if he discontinued efforts to harvest tomatoes. The two-acre crop of tomatoes on the Imperial farm (tract 44) dried up because the Filipino sharecropper who was working that plot with his crew quit in early January and refused to pick the crop. Because of the conditions as described, Tom shipped very few tomatoes that season, and there is no evidence as to how much, if any, tomatoes were shipped to the Los Angeles produce dealers to whom the Sonodas owed the advances referred to in finding 53, supra. The plaintiff seeks to recover $8,800 for loss of her tomato crops at the Niland and Imperial farms, and attributes the loss to a shortage of required labor brought about by the threatened evacuation of persons of Japanese ancestry. This claim was not specifically included among those presented to the Attorney General for administrative consideration.

Cantaloupes

55. In late 1941 the plaintiff contemplated planting a spring crop of cantaloupes. Generally, the spring crop would be planted from late December through January, so that it could reach the market prior to the arrival of better, less expensively produced cantaloupes from other producing areas where the climate would not permit an early crop such as at Niland. The plaintiff spent $4,000 in preparing 100 acres of the Niland farm to plant cantaloupes, but after the outbreak of war abandoned the plan, for some reason not adequately explained in the record. She did not present the specific claim to the Attorney General in the course of administrative proceedings.
PLAINTIFF’S INCOME AND FINANCES
56. Mary’s gross wages from her secretarial employment in Chicago for that part of 1943 following her release from the relocation center were $930.43, and for the succeeding five years through 1950 they ranged from $2,505 to $3,080 each year, on a rising scale. With this income she supported *184herself and assisted her younger sisters financially during this period. At no time from May 1942 to 1950 did she have sufficient uncommitted income or funds to meet the taxes and mortgage payments on her Imperial farm, unless she had defaulted in meeting the necessary cost of farm operation.
57. Tom earned ten cents per day while interned in 1942, and $18 per month while evacuated to the relocation center at Poston. On his release in 1944 he obtained, $200 from Mary to start a four-acre farm near Henderson, Colorado. His net profit from farming in each of the years 1945 through 1948 was, respectively, $598.98, $186.83, $2,773.40 and $645.04. In 1949 he lost $872.23. In 1950 his net profit was $934.05. With his modest post-war income he supported himself, his wife, and a widowed daughter and her children. Thus Tom had no money between 1942 and 1950 to meet taxes and mortgage payments on the defaulted Imperial and Niland farms, and no funds or equipment in 1950 to operate the Niland farm even if he or Mary had redeemed it.
58. The defendant asks that there be set off against any recovery found to be due the plaintiff certain items, including $700 for fertilizer said to have been purchased by the plaintiff prior to evacuation. There is no record or recollection by the witnesses of this bill ever having been paid, and the evidence as to the charge itself is based upon hearsay contained in an exhibit. The evidence does not satisfactorily establish the conclusion requested, namely, that evacuation resulted in plaintiff escaping payment of a bill that she would have otherwise been obliged to pay.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and it is therefore adjudged and ordered that she recover of and from the United States the amount of twenty-seven thousand nineteen dollars and forty-nine cents ($27,019.49).

 How Reed could deed tie property to Ralphs before receiving a land patent is not explained, but is immaterial.

 Why the plan involved an intermediate transfer to C. B. Ralphs is not clear, unless it was that the Alien Land Law may have made it easier for Tom, as guardian for Mary, to assume an existing encumbrance rather than to execute a new undertaking and deed of trust.

 How the Ralphs could have concluded without benefit of consulting Tom, that he had known of the error from the beginning when none of the lawyers, title companies, and the Ralphs who had initiated the error were aware of it, cannot be understood. The Ralphs either attributed unusual acumen to Tom or were so infected by the anti-Japanese hysteria of the times that they automatically believed the worst in order to impart moral justification into the foreclosure proceeding which was in the works.

 The statement was in technical error, since in 1940 the parties could not have then intended the trust deed to cover all of tract 44 because they were not then aware of the chain of errors. In 1940 they were under the illusion that the entire tract 44 was covered.

 This fact Is not formally in the record as to precise date, but appears authoritatively on page 25-a of the transcript of hearings held in 1955 by a subcommittee of the Committee on the Judiciary of the House of Representatives on legislation ultimately ripening into the act under which this suit is brought. (Serial No. 23, 83d Congress, entitled “Japanese-Ameriean Evacuation Claims.”)

 It is worthy of note that no receipts from the Jones lease of tract 44 appear in Ralphs’ accounting to Mary. It is not believed that such receipts would have been concealed if collected. Rather» it would indicate poor supervision by Ralphs and an inexcusable performance of his fiduciary duties» in the absence of contra evidence which Ralphs did not supply.

 On general principles it seems remarkable that the property sold to Mary in 1924 for $48,000 (finding 7)* was sold to Fifield in September 1943 for only $18,000 (finding 35). The drastic decline is not explained in the record and no inferences are drawn from it.

 According to Joint Exhibit 7 in the record, the Sonodas also owned another 40-acre plot of land adjoining the Niland farm and lost this under circumstances closely resembling the loss of the Niland property itself, although no mention of this loss was made in her administrative claim or in this instant proceeding. The 40 acres in question were sold to the State and the Irrigation District in 1936 for nonpayment of respective taxes, and were deeded to the State in 1941 and to the Irrigation District in 1942 for delinquent taxes. The Irrigation District was awarded a decree in 1950 to quiet title to this property, and obtained a fee simple deed to it in 1951. Page 87 of the transcript refers to a 40-aere farm which had been bought for Mary’s sisters, and this is probably the property in question.